IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **HARRY WILLIAMSON**<br>c/o Speech Law LLC<br>1265 West Sixth Street, Suite 400<br>Cleveland, OH 44113<br>*Plaintiff,*<br>v.<br>**LORAIN COUNTY**<br>226 Middle Ave.<br>Elyria, Ohio 44035<br>*and*<br>**DAVID MOORE**<br>226 Middle Ave.<br>Elyria, Ohio 44035<br>*and*<br>**MATT LUNDY**<br>226 Middle Ave.<br>Elyria, Ohio 44035<br>*and*<br>**TOM WILLIAMS**<br>105 Lakeview Circle<br>Amherst, OH 44001<br>*and*<br>**JAMES CORDES**<br>33000 Hidden Hollow Court<br>North Ridgeville, OH 44039<br>*and*<br>**LORAIN COUNTY BOARD OF COMMISSIONERS**<br>33000 Hidden Hollow Court<br>North Ridgeville, OH 44039<br>*Defendants.* | Case No.: 1:23-cv-01507-JG<br><br>Judge James S. Gwin<br><br>Magistrate Judge Jennifer Dowdell Armstrong |

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT (JURY DEMAND ENDORSED HEREON)**

PLAINTIFF'S EXHIBIT

2

This is an action to vindicate Plaintiff Harry Williamson's right to speak freely on matters of public concern without government interference.

## PARTIES

1.    Plaintiff Harry Williamson is a Lorain County resident and the County's former Director of 911 Emergency Services.

2.    Defendant Lorain County is a political subdivision of the State of Ohio.

3.    Defendant David Moore is an elected member of the Lorain County Board of Commissioners.

4.    Defendant Matt Lundy was an elected member of the Lorain County Board of Commissioners.

5.    Defendant Tom Williams was county administrator from January 6 to August 18, 2021.

6.    Defendant James Cordes was county administrator until January 2021.

## JURISDICTION & VENUE

7.    This Court has original jurisdiction over Mr. Williamson's federal claims under under 28 U.S.C. §§ 1331, 1343, and 2201. The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

8.    This Court has personal jurisdiction over all Defendants, who reside in or conduct business in Lorain County.

9.    Venue is proper under 28 U.S.C. § 1391 because the events giving rise to these claims took place within this district.

## FACTS

10.   Mr. Williamson is a telecommunications professional with more than 40 years experience installing and maintaining business communication systems for CenturyLink. From 2017

through October 30, 2020, his primary responsibility was the design, implementation, installation, and repair of Defendant Lorain County's 911 system.

11.    During that period, he was also president of the Lorain County AFL-CIO, with 7,000 members from various unions throughout the County.

12.    As president, Mr. Williamson was responsible for overseeing the organization's interviews with political candidates, including those running for Lorain County Board of Commissioners in the 2020 election.

13.    Although organized labor usually supports Democrats for public office, the Lorain County AFL-CIO was more open to Republican and independent candidates under Mr. Williamson's leadership. Mr. Williamson believed his members were better off supporting candidates based not on their partisan affiliations but on their record of support for workers's rights to organize, for workers' health and safety, and the interests of working-class families.

14.    Consistent with that agenda, the AFL-CIO withdrew its support for Commissioner Lori Kokoski, who had hired scabs to break a union strike by County workers. He instead endorsed her Republican challenger, Michelle Hung, who had a better history of working and negotiating collaboratively with labor during her time on North Ridgeville City Council.

15.    Soon after the union announced its endorsements, Mr. Williamson and his employer held an unrelated conference call with county officials about updates to their 911 system. On that call, Jim Cordes, then the County Administrator, raised the issue of the endorsements and made clear his position that Mr. Williamson should "stay neutral."

16.    Mr. Williamson did not stay neutral. Instead, he continued to advocate for his members'
       preferred candidates.

17.    Soon after, Mr. Williamson went to the 911 center to train a co-worker how to service the
       County's equipment. But immediately after they arrived, the County's 911 director,
       Tracy Lopez, told him he was no longer allowed to work in the County's facility.

18.    Mr. Williamson objected that working in the facility was his job, but Ms. Lopez insisted
       that her boss had told her to have him removed. Her boss was Mr. Cordes.

19.    Mr. Williamson explained again that Ms. Lopez was contractually obligated to let him do
       his work, but Ms. Lopez insisted that her boss wanted him to leave. Her boss was Mr.
       Cordes.

20.    Mr. Williamson warned Ms. Lopez that if he was not permitted to enter the facility, there
       would be no one to restore service in the event of an emergency. Ejecting him would
       jeopardize the County's safety, but Ms. Lopez insisted that her boss wanted him to leave.
       Her boss was Mr. Cordes.

21.    Mr. Williamson did not want to leave the County without any way of maintaining its
       system and asked what would happen if he continued to do his work. Ms. Lopez
       threatened to have him arrested, warning that her boss had ordered her to call the sheriff's
       department if he would not leave. Her boss was Mr. Cordes.

22.    Ms. Lopez told Mr. Williamson that she would ask her boss to talk to his boss to work
       out the issue. Soon after, Mr. Cordes talked to Mr. Williamson's boss, who told Mr.
       Williamson to stop talking about politics.

23.    Ms. Lopez never let Mr. Williamson back in the 911 center, and Mr. Williamson left his
       job days later, on October 30, 2020.

**Mr. Williamson enters into political and personal relationships with the Republican candidates for Board of Commissioners.**

24. Mr. Williamson consulted with Defendant Moore and Ms. Hung—both Republicans—as they campaigned to unseat two incumbent Democrats on the board of commissioners.

25. Although Mr. Williamson is a registered Democrat, Defendant Moore and Commissioner Hung recognized that he could help them make valuable connections throughout the County and respected the expertise he had developed in decades of work with the County and its elected officials.

26. Defendant Moore and Commissioner Hung won their campaigns, and they asked Mr. Williamson to serve on their transition team, where he would be responsible for recommending a new director of 911 services.

27. Soon after, Defendant Moore and Ms. Hung sent Mr. Williamson a letter offering him the 911 director position.

28. That position would make him responsible for ensuring that the County's 310,000 residents had 24/7 access to police, fire, and paramedic services through its two 911 call centers.

29. While he was serving on the transition team, Mr. Williamson and Ms. Hung began a romantic relationship.

30. Mr. Williamson expressed doubts about whether he could both accept the offer and continue in his relationship with Ms. Hung.

31. But Commissioner Hung assured him the arrangement would be neither inappropriate nor illegal. She told Mr. Williamson that the she had notified the County's new director of human resources, Jen Sinatra, of the relationship. Ms. Sinatra said that the relationship

would not violate any county policies and that she herself was likewise in involved in a romantic relationship with one of the County's elected officials.

32.  Mr. Williamson accepted the County's offer.

33.  On January 4, 2021, the County approved Mr. Williamson's appointment to his new position, as well as Defendant Williams's appointment as county administrator.

34.  Defendant Moore and Commissioner Hung voted to approve those appointments; Defendant Lundy voted against them.

35.  During the same meeting, the County approved a contract to hire Ulmer & Berne LLP "for legal consultation and advice concerning Labor and Employment matters."

36.  Days later, Commissioner Hung disclosed her relationship with Mr. Williamson to Amanda Martinsek, a partner at Ulmer, and asked whether it had any bearing on his employment.

37.  Ms. Martinsek said the relationship should have no bearing on Mr. Williamson's employment because he did not report directly to Commissioner Hung.

38.  The next day, Ms. Martinsek told Commissioner Hung that she had confirmed with another attorney that her relationship with Mr. Williamson raised no ethical or legal concerns.

**Commissioner Hung and Ms. Martinsek develop a close, personal relationship.**

39.  These conversations were the beginning of a close personal relationship between Commissioner Hung and Ms. Martinsek.

40.  They began to communicate regularly about both County business and personal affairs, discussing their romantic exploits and exchanging lurid photographs of their sexual partners.

41.  Commissioner Hung and Ms. Martinsek repeatedly met to socialize in public and private settings. They met for meals at restaurants, and Ms. Martinsek invited Commissioner Hung for dinner at her home.

42.  Ms. Martinsek repeatedly used Ulmer funds to pay for her social outings with Commissioner Hung, even when their meetings were focused on personal and sexual topics.

43.  Throughout the relationship, Ms. Martinsek assured Commissioner Hung that all their communications were protected by attorney–client privilege.

44.  Commissioner Hung kept Ms. Martinsek well informed about the status of her ongoing relationship with Mr. Williamson. She often took selfies with Mr. Williamson while they were out and forwarded them on to Ms. Martinsek.

**Mr. Williamson alerts his boss to financial mismanagement in the County's 911 program.**

45.  On November 6, 2012, Defendant Williams—then a member of the Lorain County Board of Commissioners—urged voters to approve a property tax increase that would allow the County to replace and upgrade its 911 equipment. Voters narrowly approved that levy and renewed it for five years in 2017.

46.  Although voters' property taxes were approved exclusively "for the benefit of Lorain County," Mr. Williamson knew that the County had for years been using it to subsidize LifeCare, a private, for-profit ambulance service.

47.  When the County upgraded its 911 services in 2018, for instance, Mr. Williamson helped oversee its implementation, and he was directed to install dispatch consoles not only at police and fire departments throughout the County, but also at Life Care's main office.

48.  Mr. Williamson asked Ms. Lopez, who was then the director of the 911 center, why the County was paying to provide the equipment to a for-profit business, but she urged him

to drop the issue: "Don't worry about it," she told him. "Jim Cordes wanted it, and we need to put it in."

49.  Although the equipment cost County taxpayers $35,000, no one at Life Care asked Mr. Williamson for training to use it. About a year after he installed it, an automated system alerted him that it had lost power. When he returned to LifeCare to repair the machine, he discovered that it was simply unplugged because no one there knew what it was. When he asked LifeCare employees about the situation, they didn't know that the console even existed, let alone how to use it.

50.  When Mr. Williamson became 911 director about two years later, he learned that the County was also paying more than $600 a month for LifeCare's Internet connection so it could use the console Mr. Williamson had installed. Since then, the County has spent more than $26,000 of voter's 911 levy funds for an Internet connection for a console LifeCare refuses to use.

51.  Again, Mr. Williamson alerted Defendant Williams to the misappropriation of property-tax revenues, but Defendant Williams blew him off again. He promised to "look into it," but never returned to the issue.

52.  Mr. Williamson paid the bills as ordered, but he continued to doubt the propriety of the payments. When he raised the issue in June 2021, Defendant Williams finally told him to just pay the LifeCare bills because Defendant Moore "has friends over there."

53.  In conversations with longtime 911 employees, Mr. Williamson learned that County officials had long been treating the 911 center's budget as a "catch-all" fund for expenses with no connection to its mission to dispatch life-saving assistance to county residents.

54.    For instance, Mr. Williamson identified nearly $15,000 in funds that had been spent to pay for Internet for the Department of Job and Family Services.

55.    Mr. Williamson raised the issue with Defendant Williams, who promised to look into it but never did.

56.    Because Defendant Williams was ignoring the misuse of taxpayer funds, Mr. Williamson reached out directly to JFS Director Tim Carrion. Mr. Carrion agreed that the money was being misappropriated and worked with Mr. Williamson to solve the problem without Defendant Williams's assistance.

57.    In short order, he and Mr. Carrion were able to put an end to those misappropriations.

58.    Mr. Williamson also discovered that the Emergency Management Agency had been dipping into funds from the 911 levy to pay its water bill.

59.    The County's recklessness with 911 funding was so well known that even other jurisdictions had begun taking advantage of it. In mid-2020, for instance, both Lorain and North Ridgeville stopped assigning their dispatchers to third shift, forcing the County to hire new dispatchers or pay overtime to cover the increased call volume overnight.

60.    Mr. Williamson raised the issue with Defendant Williams, explaining that Lorain and North Ridgeville's decision to abandon their dispatching duties was costing the County hundreds of thousands of dollars. He offered to negotiate for reimbursements from the police chiefs, but Defendant Williams insisted on handling those negotiations himself. On information and belief, Mr. Williams never required either Lorain or North Ridgeville to reimburse any of the money they were costing Lorain County taxpayers.

61.    The more Mr. Williamson inquired into the 911 center's finances, the more problems he discovered, including monthly payments for Carlisle Township and Lorain for services

they were not using, to Verizon for cell phones that no longer seemed to exist, and to another communications company to service modems that no one was using.

62.    Mr. Williamson raised these issues with Mr. Williams, as well. Still, Mr. Williams blew him off, telling him to just pay the bills out of 911 levy funds and forget about it.

63.    Mr. Williamson soon noticed the biggest problem yet. When the County entered into a $4.4 million contract for the 911 upgrade it had promised voters when it asked them to approve the levy, it secured agreements from every city, village, and township to pay for their share of the service. But Mr. Williamson discovered that the County had been quietly eating those costs for years, likely costing the County at least a million dollars by the time he took over.

64.    Mr. Williamson alerted Defendant Williams to the waste of taxpayer funds, but Defendant Williams blew him off—again.

**Defendant Williams pressures Mr. Williamson to use his relationship with Commissioner Hung to sway her votes on County business.**

65.    In appointing Mr. Williamson as 911 director, the County charged him with ensuring that everyone in the County had access to emergency services, without respect to their political affiliation.

66.    Mr. Williamson's job duties as 911 director generally did not include setting policy for the County or lobbying the commissioners to do so.

67.    The law does not give a 911 director such as Mr. Williamson discretionary authority with respect to the enforcement of the law, nor did it delegate to him discretionray authority to carry out policies of political concern.

68.  In appointing Mr. Williamson as 911 director, the County did not delegate to Mr. Williamson its discretionary authority with respect to the enforcement of the law, nor did it delegate to him its discretionary authority to carry out policies of political concern.

69.  In appointing Mr. Williamson as 911 director, the County did not task him with spending any significant portion of his time advising County officials how to exercise their policymaking authority.

70.  Despite Mr. Williamson's removal from the policymaking process, Defendants sought to exploit his relationship with Commissioner Hung to force him into doing so anyway.

71.  When Defendant Moore and Commissioner Hung were at odds on policy matters, Defendant Williams regularly pressured Mr. Williamson to persuade Commissioner Hung to change her position.

72.  Among other topics, Defendant Williams pushed Mr. Williamson to secure Commissioner Hung's support for a plan to entrench Republican control of the County by replacing its board of three, at-large commissioners with a slate of seven commissioners elected to represent specific portions of the county.

73.  Mr. Williams first raised the issue with Mr. Williamson in a lunch meeting in February 2020. He told Mr. Williamson that the "Seven Districts" plan was a major priority for Republican campaign donors like Jeff Riddell, Dan Reasar, David Arredondo, and Dan Gross. He explained that Defendant Moore had promised donors that he would bring the proposal to the ballot, and that he needed Commissioner Hung's support to do so.

74.  Mr. Williamson resisted the suggestion. He believed the plan would not give Lorain County voters fair representation and that it was likely to fail due to the County's political demographics.

75. Defendant Williams continued to demand that Mr. Williamson lean on Commissioner Hung to change her vote. He knew about their romantic relationship and intimated that Mr. Williamson could exploit it for political advantage.

76. If Mr. Williamson refused, it was clear his job was in jeopardy. Mr. Williams noted that he was the one who had offered Mr. Williamson his job and warned him, "you've got to work with me."

77. Concerned that he could lose his job, Mr. Williamson discussed the plan with Commissioner Hung. He explained that Defendant Williams was forcing him to help advance the Seven Districts plan, depsite his resistance.

78. Soon after, Defendant Williams began pressing Mr. Williamson to influence Commissioner Hung to support a plan to restructure the Lorain County Veterans' Committee in retaliation against its new Democratic executive director. Mr. Williamson again insisted that this was a matter for Commissioner Hung to decide on her own, and that he shouldn't be required to meddle in that process.

79. Later that month, Mr. Williams asked Mr. Williamson to assess Commissioner Hung's support for a new convention center at Midway Mall. He had secretly spent about $50,000 on a feasibility study without notifiying Defendant Lundy or Commissioner Hung, and he wanted Mr. Williamson to discreetly inquire about whether she would support or oppose such a project because she had "been acting crazy" and needed to be "straightened out."

80. In June 2021, as Mr. Williamson continued raising concerns about financial mismanagement, Defendant Williams instructed him "get Michelle on board" with a plan to blame the misspending on Democrats in the previous administration.

81.     On June 14, 2021, Mr. Williamson invited the commissioners and Defendant Williams to a meeting about plans to select a new vendor for walkie-talkies for police and firefighters. Defendants Williams and Moore wanted the County to choose a vendor with connections to Republicans in Columbus, while Commissioner Hung wanted to choose the vendor that the County's fire departments had unanimously endorsed.

82.     When Commissioner Hung did not change her position after the meeting, Defendant Williams began repeatedly calling Mr. Williamson, saying Commissioner Hung had "gone crazy," and telling him to await instructions on how he should try to influence Commissioner Hung. Defendant Williams later called him and told him to persuade her that the MARCS radio system would be better.

83.     Mr. Williamson finally asked Commissioner Hung for a meeting with her and Defendant Williams to discuss the attempts to use him to influence her votes. Commissioner Hung ordered Defendant Williams to stop using Mr. Williamson as an intermediary.

84.     But Defendant Williams continued to press Mr. Williamson to exploit the relationship to support his political goals, repeatedly reaching out to him to say that Commissioner Hung was "getting out of line," and that she needed to "get on board" with various priorities he shared with Defendant Moore.

85.     The final instance came in July 2021, when Defendant Williams admonished Mr. Williamson to "straighten out Crazy."

86.     Mr. Williamson responded that he did not know who or what Defendant Williams was talking about, and Defendant Williams explained that he was referring to Commissioner Hung and that she needed to "get on board" with Defendant Moore's attempt to steer the emergency-radio contract to MARCS.

87.    Mr. Williamson responded that Commissioner Hung made the decisions about policy

matters and that he was not able to exercise any influence over those decisions.

88.    Defendant Williams sent Mr. Williamson a text message saying only, "Wow."

**Defendants agree to fabricate a pretext for terminating Mr. Williamson.**

89.    Combined with his persistent efforts to end the County's misappropriation of 911 funds,

Mr. Williamson's refusal to lobby Ms. Hung on the radio contract was the last straw for

Defendant Williams.

90.    Although they had normally spoken at least daily up to that point, Mr. Williamson never

heard from Defendant Williams again after that message.

91.    Instead, Defendant Williams began plotting with Defendant Moore and Ms. Martinsek to

fire both Mr. Williamson and Mr. Carrion, who had assisted him in cleaning up the 911

spending issues.

92.    They worked together to fabricate a justification for terminating Mr. Williamson's

contract without exposing themselves to legal liability. They settled on Mr. Williamson's

relationship with Commissioner Hung.

93.    The relationship was a pretext. Defendants had approved the relationship months earlier,

and they did not terminate similarly situated employees who had not engaged in

whistleblowing.

94.    Because they knew their justification for firing Mr. Williamson was a pretext, Defendants

tampered with evidence to create the appearance that they had only just learned about it.

95.    The Defendants began drafting documents making false representations that they had just

learned about the relationship and discussing whether they could fire Mr. Williamson.

96.    Ms. Martinsek—eager to maintain the County's business for Ulmer & Berne—

recognized that she was in a difficult position. She wanted to facilitate her client's

objective of terminating Mr. Williamson, but her phone was filled with text messages proving that she and the County had in truth known about the relationship for months.

97.    The messages would prove pretext in a whistleblower action, so she decided to destroy them.

98.    On or about July 13, Ms. Martinsek contacted Commissioner Hung and directed her to destroy the messages they had been exchanging for the past several months.

99.    Unsure whether Commissioner Hung had complied with the directive, Ms. Martinsek followed up just after midnight on July 14, with a text message that read only "???"

100.    Commissioner Hung responded moments later: "We had 3066 messages. Deleted."

101.    Ms. Martinsek immediately gave Ms. Hung a thumbs-up for destroying the evidence:



102.    After receiving that confirmation, Ms. Martinsek began the process of drafting a memo purporting to analyze the County's exposure to liability for terminating Mr. Williamson.

103.  The memo trivialized the County's exposure, falsely writing that the County had only just learned about Mr. Williamson's relationship with Commissioner Hung and then concluding that that fact was a proper basis for firing him.

104.  At a meeting of the Board of Commissioners soon after, Ms. Martinsek distributed the memo to the board during an executive session.

105.  In that session, Defendants Moore and Lundy agreed to terminate Mr. Williamson's contract.

106.  They also agreed to terminate the contract of Mr. Carrion, who had assisted Mr. Williamson in identifying and resolving the misappropriation of 911 levy funds.

107.  The board then returned to an open meeting and ratified those agreements, with Defendants Moore and Lundy voting to terminate Mr. Williamson and Mr. Carrion, and Commissioner Hung abstaining.

108.  Defendant Moore had known of Mr. Williamson's relationship with Commissioner Hung for months. He voted in favor of termination not because of that relationship but in retaliation for Mr. Williamson's whistleblowing activity and his refusal to lobby Ms. Hung.

109.  Defendant Lundy either likewise knew of the relationship and voted to terminate the contract in retaliation, or he would have opposed the termination but for Ms. Martinsek's false representations about the discovery of the relationship.

110.  Minutes later, county officials came to the 911 center to deliver the news and march Mr. Williamson out of his building.

**Defendants pursue a sham lawsuit to interfere with Mr. Williamson's right to petition the government for redress of grievances.**

111.    Out of work and unable to find employment after being smeared in the local newspapers, Mr. Williamson hired counsel to evaluate his case.

112.    Based on apparent First Amendment violations, counsel began investigating.

113.    Counsel reached out to the defendants in that case—including Mr. Williams—to propose a quick and quiet resolution to the case.

114.    Defendants refused to entertain settlement discussions.

115.    Soon after, Mr. Williamson soon after filed a First Amendment–retaliation case against Defendants in the Lorain County Court of Common Pleas.

116.    The County answered by asserting an advice-of-counsel defense.

117.    Mr. Williamson filed a motion to compel the County to disclose that advice, and on November 21, 2022, the Court scheduled a hearing to consider the scope of the County's waiver.

118.    Facing exposure of their misconduct, Defendants threw a Hail Mary.

119.    Just hours after the court ordered a hearing on the discovery and waiver issues, Mr. Williams filed a hastily drafted lawsuit against Mr. Williamson and his attorney in the Cuyahoga County Court of Common Pleas.

120.    It alleged that Mr. Williamson had engaged in blackmail, intimidation, and honest-services fraud by receiving information from Commissioner Hung, inviting him to settlement talks, and suing him.

121.    It likewise alleged that Mr. Williamson's counsel had engaged in blackmail, intimidation, and honest-services fraud by acting as Mr. Williamson's counsel in the case.

122. But the lawsuit was never intended to redress any legitimate grievance, as Mr. Williams had already released Mr. Williamson from all liability in an unrelated agreement.

123. Instead, it was meant to drive a wedge between Mr. Williamson and his counsel.

124. Indeed, four days after filing the complaint, Mr. Williams moved to disqualify Mr. Williamson's counsel in the Cuyahoga County case.

125. And shortly thereafter, Mr. Williams's counsel e-mailed the County's lawyers to notify them of the motion to disqualify and discuss their shared interest in using it to subsequently trigger a disqualification in the Lorain County case, as well.

126. That motion was successful—at least temporarily.

127. Citing no facts and no law, the Cuyahoga County Court of Common Pleas determined that Mr. Williamson's attorney was "disqualified under ethical canons" from representing him.

128. Mr. Williamson took an interlocutory appeal of that decision.

129. When the Eighth District finally heard oral arguments nearly a year later, it needed only nine days to reverse the order.

130. Shortly thereafter, the Cuyahoga County Court of Common Pleas entered judgment against Mr. Williams and dismissed all his claims against Mr. Williamson and his counsel, with prejudice.

**Mr. Williamson's injuries were the result of municipal policy.**

111.131. Mr. Williamson's termination was not the result of rogue employees. Rather, it was the result of County policies or customs made by employees whose edicts or acts represent official policy.

112.132. The plan to terminate Mr. Williamson came from the highest levels, beginning with the County Administrator and approved by the Board of Commissioners itself.

113.133.    Likewise, the decision to terminate Mr. Williamson was the result of the County's

deliberate indifference to First Amendment rights and its failure to adequately train and

supervise its employees on the protection of those rights.

114.134.    Although he wields great power over potential whistleblowers such as Mr.

Williamson, the County provided Mr. Williams with no training or supervision to ensure

his own political agenda or partisan preferences did not taint his judgment when

supervising them.

115.135.    Had the County properly trained or supervised Defendant Williams, he would not

have interfered with Mr. Williamson's employment in retaliation for Mr. Williamson's

protected speech and conduct.

**Mr. Williamson suffered injuries as a result of Defendants' misconduct.**

116.136.    As a direct and proximate result of Defendants' actions, Mr. Williamson has

suffered and continues to suffer economic and non-economic damages for which

Defemdamts are liable.

117.137.    Mr. Williamson suffered injuries proximately caused by Defendants' misconduct.

118.138.    Defendants' misconduct caused the termination of Mr. Williamson's job and the

loss of his livelihood.

119.139.    Defendants' misconduct caused lasting reputational damage to Mr. Williamson,

who continues to struggle to find new employment.

120.140.    Defendants' misconduct caused Mr. Williamson serious emotional injuries that

persist to this day.

141.    Defendants' misconduct caused Mr. Williamson to take on substantial additional debts to

resolve the Cuyahoga County case.

~~121.~~142.     Defendants' acts were willful, egregious, malicious, and worthy of substantial

sanction to punish and deter them and others from engaging in this type of unlawful

conduct.

## CLAIM 1
### FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983)

~~122.~~143.     Mr. Williamson re-incorporates all the preceding allegations.

~~123.~~144.     The First Amendment protects Mr. Williamson's right to free speech, freedom of

association, freedom of assembly, and freedom to petition the government for redress of

grievances.

~~124.~~145.     Throughout his time working for or with Lorain County, Mr. Williamson engaged

in activity protected by the First Amendment, including his advocacy for union-backed

political candidates, his opposition to the waste of 911 funds, his relationship with

Commissioner Hung, and his refusal to lobby Commissioner Hung.

~~125.   Defendants sought to interfere with and punish Mr. Williamson's exercise of those rights~~

~~by leaking embarrasing information about him to the press, freezing him out of~~

~~government decision-making, and terminating his employment.~~

146.     Because Mr. Williamson's exercise of these freedoms put him in opposition to

Defendants and in alignment with their political opponents, Defendants undertook a

Retaliation Campaign designed to interfere with and punish Mr. Williamson's exercise of

those rights.

147.     The Retaliation Campaign included interference with his ability to do his job, leaking

embarrasing information about him to the press, freezing him out of government

decision-making, terminating his employment, destroying evidence, engaging in

litigation misconduct, and other actions.

126.148.    Their retaliatory conduct injured Mr. Williamson by restraining, preventing, and impairing his exercise of his rights, and did so in a way likely to chill a person of ordinary firmness from continuing to exercise those rights.

127.149.    Their conduct was motivated by a desire to punish Mr. Williamson for the exercise of his First Amendment rights.

### CLAIM 2
### EQUAL PROTECTION VIOLATION (42 U.S.C. § 1983)

128.150.    Mr. Williamson re-incorporates all the preceding allegations.

129.151.    The Fourteenth Amendment guarantees Mr. Williamson's right to equal protection of the laws without regard to his exercise of his rights to free speech and freedom of association.

130.152.    In terminating Mr. Williamson, Defendants relied on his relationship with Commissioner Hung as a pretext.

131.    Defendants have long permitted similar romantic relationships between elected officials and County employees.

153.    Defendants have long permitted similar romantic relationships between County employees in each others' chains of command when those employees do not speak out or otherwise align themselves against the government's controlling faction.

154.    In truth, Defendants undertook the Retaliation Campaign because of Mr. Williamson's exercise of his First Amendment rights in opposition to that faction.

155.    Mr. Williamson was entitled to equal protection of the law, despite his membership in a group of political dissenters and despite his exercise of his fundamental rights.

132.156.    Whether the termination was based on his speech or his relationship, it violated Mr. Williamson's right to equal protection.

## CLAIM 3
### WHISTLEBLOWER RETALIATION (OHIO REV. CODE § 4113.52)

~~133.~~157.    Mr. Williamson re-incorporates all the preceding allegations.

~~134.~~158.    Ohio Rev. Code § 4113.52 prohibits employers from retaliating against

employees who report a reasonable belief that a co-worker has committed "a criminal

offense that is likely to cause an imminent risk of physical harm to persons or a hazard to

public health or safety, a felony, or an improper solicitation for a contribution."

~~135.~~159.    Mr. Williamson reasonably believed that the waste and misappropriation of funds

from the 911 levy was a a criminal offense that was likely to cause an imminent risk of

physical harm to persons or a hazard to public health or safety, a felony, or an improper

solicitation for a contribution.

~~136.~~160.    Mr. Williamson repeatedly made oral and written reports of the misuse of 911

funds to his supervisor, Defendant Williams. Defendant Williams did not correct those

violations or make a reasonable and good faith effort to correct those violation within 24

hours.

~~137.~~161.    Mr. Williamson followed up by reporting the violation to Commissioner Hung.

~~138.~~162.    Because Mr. Williamson reported these violations, Defendants deliberately

retaliated against him by terminating his employment contract and otherwise pursuing the

Retaliation Campaign identified in Paragraphs 146 through 149.

## CLAIM 4
### INTERFERENCE WITH CIVIL RIGHTS

~~139.~~163.    Mr. Williamson re-incorporates all the preceding allegations.

~~140.~~164.    Under Ohio Rev. Code § 2307.60, any person injured by a criminal act may

recover full damages in a civil action.

141.165.    Under Ohio Rev. Code § 2921.45, "[n]o public servant, under color of the public servant's office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right."

142.    Article I, Section 11 of the Ohio Constitution protects Mr. Williamson from retaliation based on the exercise of his right to "freely speak, write, and publish his sentiments on all subjects."

166.    The First Amendment to the United States Constitution protects Mr. Williamson's rights to free speech, to free association, to free assembly, and to petition the government for redress of greivances.

167.    The Fourteenth Amendment to the United States Constitution protects Mr. Williamson's right to equal protection of the law, despite his membership in a group of political dissenters and despite his exercise of his fundamental rights.

168.    Article I of the Ohio Constitution likewise protects those rights.

169.    Through the Retaliation Campaign identified in Paragraphs 146 through 149, Defendants conspired to, attempted to, and did deprive Mr. Williamson of those rights.

143.170.    For instance, Defendant Cordes knowingly acted under color of his office, employment, or authority to deprive Mr. Williamson of his constitutional right to free speech by interfering with his ability to fulfill his professional responsibilities, in retaliation for Mr. Williamson's speech supporting Republican candidates in the 2020 elections for Lorain County Board of Commissioners.

144.171.    Likewise, Defendants Moore, Lundy and Williams knowingly acted under color of their office, employment, or authority to deprive Mr. Williamson of his constitutional right to free speech by terminating his employment contract in retaliation for his speech

blowing the whistle on the County's misappropriation of 911 funds, and for his refusal to lobby Ms. Hung to support their priorities.

## CLAIM 5
### SPOLIATION

145.172.    Mr. Williamson re-incorporates all the preceding allegations.

146.173.    Ms. Martinsek, Ulmer & Berne, and Lorain County knew that litigation involving Mr. Williamson was probable.

147.    Acting on behalf of Defendant Lorain County, Ms. Martinsek nonetheless willfully destroyed evidence to disrupt Mr. Williamson's case.

174.    As part of the Retaliation Campaign identified in Paragraphs 146 through 149, Ms. Martinsek—acting on behalf of Defendant Lorain County—nonetheless willfully interfered with Mr. Williamson's First Amendment right to petition the government for redress of greivances by destroying evidence.

148.175.    The destruction of that evidence disrupts Mr. Williamson's case by depriving him of proof of pretext and making it more difficult for him to settle the case on just terms.

## CLAIM 6
### DESTRUCTION OF PUBLIC RECORDS

149.176.    Mr. Williamson re-incorporates all the preceding allegations.

150.177.    Under Ohio Rev. Code § 149.351, a public office's records "are the property of the public office concerned and shall not be removed, destroyed, mutilated, transferred, or otherwise damaged or disposed of, in whole or in part, except as provided by law or under the rules adopted by the records commissions."

151.    Acting on behalf of Defendant Lorain County, Ms. Martinsek destroyed the County's records by deleting text messages between herself and Commissioner Hung.

178.   As part of the Retaliation Campaign identified in Paragraphs 146 through 149, Ms.

Martinsek—acting on behalf of Defendant Lorain County—destroyed the County's

records by deleting text messages between herself and Commissioner Hung.

~~152.~~179.        Mr. Williamson is aggrieved by the destruction of those messages. He sought

access to them, but he never received them and will never be able to use them as evidence

of pretext in this action.

180.   The destruction of that evidence disrupts Mr. Williamson's case by depriving him of

proof of pretext and making it more difficult for him to settle the case on just terms.

## CLAIM 7
### MALICIOUS PROSECUTION

181.   Mr. Williamson re-incorporates all the preceding allegations.

182.   As part of the Retaliation Campaign identified in Paragraphs 146 through 149, Mr.

Williams—encouraged and assisted by his fellow Defendants—maliciously instituted a

civil claim and disqualification proceedings against Mr. Williamson and his counsel.

183.   Neither the complaint nor the motion was supported by probable cause.

184.   That case terminated in Mr. Williamson's and his counsel's favor, as the court dismissed

all claims against them.

185.   During that proceeding, the Court ordered Mr. Williamson and his counsel not to open or

review records they had gathered in the course of litigation.

## CLAIM 8
### ABUSE OF PROCESS

186.   Mr. Williamson re-incorporates all the preceding allegations.

187.   In the alternative, Mr. Williamson alleges that Defendants, as part of the Retaliation

Campaign identified in Paragraphs 146 through 149, set a legal proceeding in motion in

proper form and with probable cause.

188.    By seeking to disqualify Mr. Williamson's counsel, Defendants perverted that proceeding to accomplish an ulterior purpose for which it was not designed.

## PRAYER FOR RELIEF

Mr. Williamson therefore respectfully requests the following relief:

A. Enter judgment in his favor on all claims for relief;

B. Declare that Defendants' acts and conduct constitute violations of Article I, Section 11 of the Ohio Constitution.

C. Award injunctive relief barring further retaliation against Mr. Williamson.

D. Declare that Defendants are liable for damages on all claims brought against them.

E. Award full compensatory damages including, but not limited to, damages for pain and suffering, mental anguish, and emotional distress that Mr. Williamson has suffered and is reasonably certain to suffer in the future;

F. Award punitive and exemplary damages for the Defendants' egregious, willful, and malicious conduct;

G. Award Mr. Williamson $1,000 per violation of Ohio Rev. Code § 149.351(A);

H. Award pre– and post-judgment interest at the highest lawful rate;

I. Award reasonable attorneys' fees and all other available costs of suit; and

J. Award all other relief in law or equity that the Court deems equitable, just, and proper.

## JURY DEMAND

Mr. Williamson demands a trial by jury on all issues within this complaint.

Respectfully submitted,

*/s/Brian D. Bardwell*
Brian D. Bardwell (0098423)
Speech Law, LLC
1265 West Sixth Street, Suite 400
Cleveland, OH 44113-1326
216-912-2195 Phone/Fax
brian.bardwell@speech.law

*Attorney for Plaintiff Harry Williamson*