## Affidavit of Brian D. Bardwell

I, Brian D. Bardwell, having been duly sworn, state as follows:

1. I am over the age of 18 and competent to testify to the facts below based on personal knowledge.

2. I am the sole member of Speech Law LLC.

3. I went to law school and opened Speech Law to advocate for people who have been injured by government intrusions on their right to free speech but lack the resources to pay for high-quality legal representation.

4. Because my client base is solidly working– and middle-class, they can rarely afford to pay for my work, even when I provide steeply discounted services or alternative fee arrangements.

5. As a result, I have likely provided more than $100,000 in legal services in the last year for clients who I have no reason to believe will ever pay me.

6. Because doing so would be inconsistent with my mission to provide high-quality legal services to those who cannot afford them, I have never terminated a client for failing to pay bills on time, despite their arrearages.

7. I came to represent Harry Williamson in this case as part of this mission. Mr. Williamson was the president of the Communications Workers of America Local 4370 and an employee of Lorain County while Plaintiff Williams was devloping a plan to entrench Republican Party control of Lorain County government by restructuring the Board of Commissioners. Plaintiff Williams pressured Mr. Williamson to persuade Commissioner Hung to support that plan and fired him when he refused.

8. Because Mr. Williams relied on Mr. Williamson's relationship with Commissioner Hung as a pretext for terminating him, I sought evidence that the County knew about the relationship long before terminating him.

9. To that end, I sought phone records for Amanda Martinsek, who was a defendant in the Lorain County case. My investigation revealed that Ms. Martinsek and her law partner, who were employment counsel for Lorain County, knew about and had approved Mr. Williamson's relationship with Commissioner Hung, but nonetheless participated in the County's efforts to use it as a pretext to fire him. Before the County terminated Mr. Williamson, Ms. Martinsek ordered the destruction of evidence of her knowledge of that relationship.

10. I had sought access to Ms. Martinsek's phone records in discovery in the Lorain County case, but she refused to produce any, requiring me to seek a subpoena instead.

11. Although part of Ms. Martinsek's objection was rooted in attorney–client privilege, my client's position was that Lorain County had waived privilege by asserting an advice-of-

**EXHIBIT D**

counsel defense in its answer. When we raised that issue by motion, the judge assigned to the case recused and asked for a referral to a visiting judge. That motion remained pending when I issued my subpoenas.

12. I also sought to establish pretext by demonstrating that the County permitted similarly situated employees to carry on intraoffice romatic relationships without terminating them.

13. To prove the existence of those relationships, I sought access to phone records that would demonstrate that employees were calling each other more frequently than County business required, meeting after hours, and discussing their relationships.

14. For instance, I sought the phone records of Plaintiff Williams and Katherine Loos to prove that they were involved in a romantic relationship while Mr. Williams supervised Ms. Loos as an employee of the County. Ms. Loos has since admitted that she is Mr. Williams's girlfriend.

15. Attorneys Jeremy Iosue and Brian Lee, representing Tom Williams and Lorain County, conceded that information about such relationships would be relevant but objected to producing it themselves. After a meet and confer, we reached an agreement to obtain those records through a subpoena.

16. Mr. Iosue and Mr. Lee agreed that they would not move to quash my subpoenas if their language was "straightforward." To avoid any disputes over that language, I sent a copy of my standard subpoena language for cell-phone records to Mr. Iosue and Mr. Lee, first on September 8, 2022, and again on September 26, 2022. Authentic copies of those messages is attached as Ex. A-1 and A-2.

17. A month after I first sent the subpoena language, neither Mr. Iosue nor Mr. Lee had responded to it. I checked in again to see if they had any issues with it. Neither of them responded. An authentic copy of that message is attached as Ex. A-3.

18. On November 3, 2022, they provided me with a list of phone numbers to subpoena. Although they knew what language I planned to use, they never objected to it.

19. I was in the process of preparing my subpoenas when I learned that Plaintiff Williams had sued me in this case for representing Mr. Williamson in the Lorain County case.

20. Because proof of Mr. Williamson's allegations in the Lorain County case would disprove Mr. Williams's allegations of abuse of process in this case, I identified those phone records as equally relevant to this case.

21. Because those phone records were relevant to both the Lorain County and Cuyahoga County cases, I chose to issue the subpoenas under the Cuyahoga County case number, as litigating in Cuyahoga County, where I live and maintain an office, is more convenient than litigating in Lorain County, which does not allow e-filing and requires a trip to Elyria for every filing.

22. Based on my previous interactions with mobile carriers, I understood that they preferred to receive courtesy copies of subpoenas by e-mail or fax, but would not process any records until a subpoena was formally issued from the Court.

23. I therefore sent courtesy copies of the subpoenas in this case—using the same language I had submitted to Mr. Williams's counsel—to AT&T, T-Mobile, and Verizon.

24. When I sent those subpoenas, I expected that the providers would not begin processing them until I filed and issued service copies.

25. I began drafting an e-mail to serve Mr. Williams with copies of those subpoenas, but I never sent it. I cannot say for sure why that was, but I assume that I walked away from the computer while drafting it and later assumed that I had already sent it because I remembered writing it.

26. As Plaintiff Williams began filing successive motions for sanctions, I decided that Mr. Williamson would be best served if we slowed down the pace of the case, and I chose to postpone formally issuing the subpoenas.

27. Based on my previous interactions with the mobile providers, I assumed that they would take no action on the courtesy copies I had delivered and that there was therefore no action for me to take on those subpoenas.

28. I did not learn that any of the providers had instead moved forward with the subpoenas until their targets notified me. Several targets demanded that I withdraw the subpoenas entirely, while others requested that I modify them to avoid any undue burden or expense.

29. While I was not willing to withdraw the subpoenas entirely, I was perfectly happy to work with any of the targets to find agreeable terms on which to modify them to address privilege or other issues.

30. For instance, I received an e-mail from Matthew Nakon at Wickens Herzer Panza, who indicated that he believed one of my subpoenas could return privileged or irrelevant records from his firm. He asked me to modify the subpoena to exclude those records, and we reached an agreement over the course of four e-mails over a single afternoon. An authentic copy of those communications is attached as Ex. A-4.

31. I sought an opportunity to be heard on the issue of sanctions, but the Court conducted its October 12, 2023 hearing entirely in chambers and off the record. When I asked for an opportunity to address the Court, the Court refused to hear from me.

32. I do not have resources with which to pay the Court's $79,959.50 sanction. I own no real estate, and my assets reflect my decision to pursue public-interest litigation.

33. I own:

    a. A 10-year-old Subaru.

      b. Personal bank accounts totaling $2,764.74.

      c. Business bank accounts totaling $29,896.70, including $2,229.14 that I have set aside for taxes.

      d. No furniture, appliances, clothing, jewelry, or antiques worth selling.

34. My liabilities include:

      a. A car loan with an outstanding balance of $14,737.93.

      b. A personal Visa credit card with an outstanding balance of $3,468.73.

      c. A business Visa credit card with an outstanding balance of $2,916.54.

      d. A business line of credit with an outstanding balance of about $9,099.77.

      e. About $3,355.12 owed to court reporters.

      f. About $5,000 in tuition for my daughter's elementary school.

      g. My landlord is also currently seeking $1,050 in back rent and attempting to increase my rent by about 15 percent.

35. The proceedings to date have been more than sufficient to deter me from failing to enter an appearance or failing to serve subpoenas on opposing counsel.

36. The Court's sanctions order will likely have the further effect of pushing me into bankruptcy and deterring me from continuing to practice the law.

37. I have already begun the process of searching for new work in other fields and notifying clients that I cannot afford to continue representing them.

After first being duly cautioned and sworn, I swear that the preceding statements are true, based on my personal knowledge.

_____
Brian D. Bardwell

STATE OF OHIO            )
                         ) SS.
COUNTY OF CUYAHOGA       )

Sworn to and subscribed before me on 10/20/23.

_____
Notary Public, State of Ohio
My commission expires: 05/20/26



DYLYN BAYZL HAZEN
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
05-20-2026