## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **HARRY WILLIAMSON**, | CASE NO. 1:23-cv-01507 |
| Plaintiff, | JUDGE JAMES GWIN |
| v. | |
| **LORAIN COUNTY**, *et al.,* | |
| Defendants. | |

### DEFENDANTS' REPLY IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

### <u>INTRODUCTION</u>

Relying exclusively on the allegations in his unverified complaint and a self-serving declaration riddled with hearsay, Williamson feebly attempts to manufacture a disputed fact sufficient to survive summary judgment. And, while Williamson falsely claims that he does not have sufficient discovery to respond to the motion, he ignores the tens of thousands of documents that he received in state court before voluntarily dismissing these claims. (*See* Doc. 30).[1] After years of litigation, and tens of thousands of pages of discovery, Williamson still has no evidence to support his conspiratorial claims of retaliation. Commissioners Moore and Lundy, acting on behalf of the County, terminated Williamson because of his undisclosed extramarital affair with Commissioner Hung. This case is no more complicated than that. Williamson's post-hoc and baseless assertions of

---

[1] At the recent status conference held on July 18, 2024, Plaintiff's Counsel did not dispute when the Court noted that the purported outstanding discovery was unrelated to Defendants' motion for summary judgment.

pretext should be rejected, and Defendants' motion for summary judgment should be granted.

## LAW AND ARGUMENT

**A. Unverified allegations in the Complaint and Williamson's self-serving declaration are not valid evidence to counter a motion for summary judgment.**

As more fully set forth in Defendants' motion to strike (Doc. 31), Williamson's self-serving declaration, which relies principally on unsupported hearsay, does not meet the standards required under Fed. R. Civ. P. 56 and should be struck. (Doc. 31); *see also U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1189 (6th Cir. 1997) (recognizing hearsay "must be disregarded" at summary judgment and noting that "evidence submitted in opposition to a motion for summary judgment must be admissible."). Likewise, a self-serving declaration—standing alone—is insufficient to create an issue of material fact. *E.g.*, *Sperber v. Nicholson*, 342 F. App'x 131, 132 (6th Cir. 2009) ("[plaintiff's] prima facie case thus relies on his own self-serving innuendo and speculation, which does not suffice to survive summary judgment. It was not error to grant summary judgment to the defendant."); *see also Sublett v. Masonic Homes of Ky., Inc.*, 2022 WL 2798998, 2022 U.S. App. LEXIS 19876, at *23 (6th Cir. July 18, 2022) (affirming summary judgment where plaintiff's "only evidence" on certain prima facie elements of her claims came from a self-serving affidavit that was insufficient to create a genuine dispute for trial.)

Aside from his faulty declaration, Williamson repeatedly relies on allegations in his Complaint, which are unverified and denied by Defendants. (*See* Doc. 29, fn. 2-4, 7, 8, 27). "Unverified pleadings, such as unverified complaints, are not considered Rule 56 evidence. Speculative and conclusory allegations are insufficient to withstand a motion

for summary judgment." *Zeune v. Mohr*, 2015 WL 6468541, 2015 U.S. Dist. LEXIS 145522, at *17 (S.D. Ohio Oct. 27, 2015) (citing *Emmons v. McLaughlin*, 874 F.2d 351, 354-55 (6th Cir. 1989); *see also Vance v. Plastics*, No. 1:23-cv-00703, U.S. Dist. LEXIS 125999, *10 (N.D. Ohio Feb. 20, 2024) ("Unsupported and vague assertions are not evidence however. Nor are allegations in an unverified complaint.") The Court should disregard all "evidence" derived from Williamson's unverified complaint or self-serving declaration. Without these baseless allegations, Williamson's case completely crumbles.

### B. Williamson's Ohio Whistleblower claim (Count Three) fails because he has no evidence of a detailed written report or discriminatory retaliation.

Williamson devotes a mere footnote to the glaring hole in his Ohio whistleblower claim – the lack of any **written** report. (*See* Doc. 29, fn. 5). An employee must "strictly comply" with the statutory reporting requirements to obtain whistleblower protection. *Lee v. Village of Cardington*, 142 Ohio St.3d 488, 490 (2014) (affirming summary judgment on Ohio whistleblower claim where employee failed to present evidence of a valid written report to his employer). This includes a specific and detailed report ***in writing***:

> the employee must orally report the violation to his or her supervisor or other responsible officer and subsequently shall file with that supervisor or officer a *written report that provides sufficient detail to identify and describe the violation*. If the employer does not correct or make a good faith effort to correct the violation within 24 hours, the employee may then notify outside authorities.

*Id.* (internal quotes and citations omitted) (emphasis added).

The written reporting requirement is an essential element to Williamson's prima facie case, and it remains his burden to establish it. *See Klepsky v. UPS*, 489 F.3d 264, 271 (6th Cir. 2007) (articulating burden-shifting standard). Williamson proffers no

admissible evidence to establish "a written report that provides sufficient detail to identify and describe the violation." *Lee*, 142 Ohio St.3d at 490. The most Williamson can muster is a single vague paragraph in his self-serving (and inadmissible) declaration. (Doc. 29-1, at ¶ 15). Specifically, Williamson alleges discovering "multiple instances of misspending of funds from the County's 911 levy." (*Id.*). He claims that the "massive scope of the misappropriations...may have constituted felonies." (*Id.*) He then claims to have reported these problems to Williams and Hung, "both orally and in writing." (*Id.*).[2] Williamson conveniently fails to articulate a *single* example of these purported "misappropriations," and such vague allegations of misconduct is insufficient to satisfy Ohio's whistleblower statute. *Lee*, 142 Ohio St.3d at 492 (noting that the plaintiff's report of "equipment failures" resulting in purported illegal discharges "does not qualify as a report that sufficiently identifies and describes any crimes involving the village, as the statute requires.")

Even if the Court were to accept Williamson's self-serving testimony that he made such reports "in writing," the report is insufficient to cloak Williamson in whistleblower protection. But, there is not a shred of evidence that Williamson ever made a written report. Williamson does not attach any writing to his declaration, and none exists in the county records. The County has produced more than 36,000 pages of documents, including those from Williamson's county email address. There is no written report. Indeed, Williamson produced *hundreds of pages* of alleged text messages between himself and Commissioner Hung and between himself, Hung, and Williams. Nowhere in

---

[2] In his responses to discovery, Williamson disclaimed any specific knowledge of making these reports. (*See* Doc. 27-3, Page ID 367) (noting Williamson "does not currently recall the precise manner and date of each communication.")

those texts does Williamson raise any issues related to misspending funds from the County's 911 levy. Without any evidence of a detailed written report, Williamson's whistleblower claim fails.

Without valid whistleblowing activity, Williamson cannot establish that Defendants terminated him in retaliation for the whistleblowing. Instead, undisputed evidence demonstrates that Williamson's termination stemmed from his undisclosed adulterous affair with Commissioner Hung. Williamson's scattershot allegations of first amendment and whistleblower retaliation do not overcome his burden to prove that the termination was pretextual.[3] There is no evidence that the ultimate decisionmakers, Lundy and Moore, knew anything about Williamson's alleged reports of 911 misspending, and Williamson does not allege that he ever informed them about it. (*See* Doc. 29-1, at ¶ 15) (alleging that he reported to Hung and Williams only). Simply put, Williamson's self-serving allegations, unsupported by *any* other evidence, are insufficient to establish pretext.

Finally, there is no individual liability under Ohio's whistleblower statute. *See, e.g., Armstrong v. Trans-Service Logistics Inc.,* 2005-Ohio-2723, ¶ 43 (5th Dist.) ("We therefore hold that R.C 4113.52, the 'whistleblower' statute, creates liability for the

---

[3] The burden-shifting under Williamson's Ohio whistleblower claim is slightly different than his First Amendment retaliation claim. *Compare Klepsky*, 489 F.3d at 272 ("If a plaintiff makes out a prima facie case, 'the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the action taken. Should the employer be able to state a non-retaliatory reason for the action taken, the burden then returns to the plaintiff to come forward with some evidence to show that the employer's stated reason was, in fact, pretext.'"), *with Holsapple v. Cunningham*, 817 F. App'x 95, 102, n. 4 (6th Cir. 2020) ("As correctly noted by the district court, the *McDonnel Douglas* burden-shifting analysis does not apply within the context of First Amendment retaliation claims. Therefore, if the defendant can show that the same action would have been taken absent plaintiff's protected activity, 'the burden does not shift back to a plaintiff to show pretext.'" (citing *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001)). Under both standards, Williamson's respective claims fail.

'employer,' *i.e.* the corporate entity . . . a strict and literal reading of the statute, as well as the case law from the Ohio Supreme Court, foreclose finding an individual supervisor liable for wrongful discharge under the statute."); *Keehan v. Korenowski*, 2017-Ohio-7050, ¶ 14, 95 N.E.3d 781, 786 (9th Dist.) (noting that the remedies afforded under the whistleblower statute "are clearly designed to be levied against the corporate entity as opposed to an individual supervisor.") (internal quotes and citations omitted). *McKay v. Safe Auto Ins. Grp., Inc.,* No. 2:20-cv-1584, 2021 U.S. Dist. LEXIS 22951, at *20 (S.D. Ohio Feb. 8, 2021) ("Plaintiff has not persuaded this Court that the Ohio Supreme Court would reach a contrary holding to *Keehan* and *Armstrong* . . . [a]ccordingly, the Court concludes that Plaintiff has failed to state a claim for individual liability . . . under the Ohio Whistleblower statute."). Since the Board of Commissioners is not a party to this case, Defendants Moore, Lundy, Williams, and Cordes cannot be held individually liable under Ohio's whistleblower statute.

**C. Williamson's First Amendment retaliation (Count One) and interference with Ohio Civil Rights (Count Four) fail because Williamson lacks evidence of any purported retaliation, and he was terminated for a clear non-retaliatory reason.**

    i. <u>Williamson cannot prove a prima facie case of retaliation. But, even if he could, the County's clear non-retaliatory reason for the termination ends the inquiry.</u>

As a threshold issue, Williamson lacks any evidence to establish causation between his alleged first amendment activities and his termination. "To prove causation, [Williamson] must show that his First Amendment protected activities were a 'motivating factor', *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002), or 'essentially a but-for cause – 'without which the action being challenged simply would not have been taken.'" *Holsapple*, 817 F. App'x at 101 (quoting *Leanard v. Robinson v. Robinson*, 477 F.3d 347,

355 (6th Cir. 2007) (additional citations omitted)). This requires more than "bare allegations of malice," and Williamson must "point to specific, nonconclusory allegations reasonably linking [his] [protected activities] to employer discipline." *Id.*, *quoting Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003).

Williamson's purported First Amendment activity is exceedingly thin. Specific to his termination, Williamson alleges that he (a) complained about 911 misspending, and (b) refused to lobby Commissioner Hung on Williams's behalf. (Doc. 29, at p. 4).[4] As discussed above, there is no evidence that Williamson "blew the whistle on the misappropriation of 911 funds," much less that Lundy or Moore considered this in deciding to terminate Williamson's at-will employment. Likewise, Williamson's vague assertion that he refused *Williams's* demands to "lobby" Hung does not explain how that is the but-for cause of Lundy's and Moore's decision to terminate him.[5]

Williamson acknowledges that Defendant Williams had no personal involvement in Williamson's termination, and thus relies on a "cat's paw" theory to link Williams to the termination. This theory allows a court to "impute knowledge and discriminatory intent" from a person with a retaliatory motive to a decisionmaker. *See Bose v. Bea*, 947 F.3d 983, 990 (6th Cir. 2020). Importantly, no court in the Sixth Circuit has applied cat's paw liability in the context of a First Amendment retaliation claim, and Williamson cites none. *See Carter v. Mandy*, No. 21-cv-11568, 2023 U.S. Dist. LEXIS 230279, at *17 (E.D. Mich. Dec. 28, 2023) ("[T]he Court has found no case in the Sixth Circuit applying cat's

---

[4] Williamson cites to his unverified (and denied) allegations in his Complaint.

[5] Williamson's Opposition falsely states that Defendant Williams admitted that he terminated Williamson's employment. (*See* Doc. 29, Page ID# 482). Williams did not have the authority to terminate Williamson, and his Answer reflects that. Williams admitted Paragraph 105 of Plaintiff's Complaint, which states, in part, "Defendants Moore and Lundy agreed to terminate Mr. Williamson's contract." (*See* Doc. 9, Page ID# 79).

7

paw liability where the sole claim is a First Amendment retaliation claim and this Court shall not extend the doctrine."). Moreover, Williamson has no evidence to demonstrate Williams's personal involvement in the termination decision, and the Declarations of Lundy and Moore confirm just the opposite.

Even if Williamson could prove that Williams was somehow involved in his termination, the same-actor inference would strongly weigh against any finding of pretext. *See Mencarelli v. Alfred Williams & Co.,* 656 F. App'x 80, 87 (6th Cir. 2016) (explaining the same-actor inference "allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee."). Williamson acknowledges in Paragraph 8 of his Declaration that Williams got him the job as the 911 Director. (*See* Doc. 29-1, Page ID 490) ("After the election, Defendant Williams asked me to replace Ms. Lopez as 911 Director.") This weighs against any finding of pretext and a causal connection for Williamson's termination.

There can be no genuine dispute that the County terminated Williamson for a valid, non-retaliatory reason. His secret extramarital affair with Commissioner Hung, his superior who also cast the deciding vote in favor of his employment, violated the ethical and moral standards expected of his position and brought discredit to the County. (*See* Doc. 27-2, Page ID# 360-61); (*see also* Exhibit A, Joint Statement by Commissioners Lundy and Moore, WILLIAMSON_000458). Williamson's termination came just days after Hung revealed the illicit affair to Moore and Lundy. (Doc. 27-1, 27-2). The bipartisan decision to terminate Williamson was motivated by only one reason, and that reason is fatal to Williamson's claims.

Given the undisputed, non-retaliatory rationale leading to Williamson's termination, there is no need for the Court to delve into Williamson's conspiratorial

musings about pretext. Even if Williamson could establish a prima facie case of retaliation, "if the defendant can show that the same action would have been taken in the absence of the protected activity, the defendant is entitled to prevail on summary judgment." *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001) (citing *Thaddeus-X*, 175 F.3d 378, 395 (6th Cir. 1999)); *see also Holsapple*, 817 F. App'x at 102, n. 4 ("Therefore, if the defendant can show that the same action would have been taken absent plaintiff's protected activity, 'the burden does not shift back to the plaintiff to show pretext.'")

Williamson was an at-will employee engaged in an undisclosed extramarital affair with a sitting county commissioner that included sexual intercourse inside County buildings. After Hung finally disclosed the affair to her fellow Commissioners, Moore and Lundy voted to terminate Williamson's employment as a violation of County policy. (Doc. 27-1, 27-2, attaching Ulmer Memo; *see also* Ex. A, Joint Statement). Williamson's conduct was not only inappropriate but disruptive to his public employment and undeniably would have resulted in his termination regardless of any constitutionally protected activity.

Moreover, Williamson's evidence of "pretext" is exceedingly weak. He claims that Lundy and Moore "knew about the relationship for months before acting on it." (Doc. 29, at Page ID# 482). This is directly contradicted by Commissioner Hung's testimony, who stated that she never told Moore or Lundy about the affair until late July 2021. (*See* Doc. 31-1) (Excerpts from Hung Deposition). Lundy similarly testified that Hung did not tell him about the affair and that she should have prior to Williamson's hiring. (Exhibit B,

Excerpts from Deposition of Matthew Lundy).[6] Hung reiterated this to Williamson in a text in August 2021, when she texted "I told NOBODY. U know what it is now." (Exhibit C, Excerpts of Williamson's Document Production, at Williamson_001135).

Williamson also contends that he "never saw any policy that forbade or governed romantic or sexual relationships between employees." (Doc. 29-1, Page ID# 491). However, the County's personnel manual provides that "[a]ll employees are expected to maintain the highest possible ethical and moral standards" . . . and "[c]onduct that interferes with normal business operations, brings discredit to the Office or County, is illegal, or is offensive to the public or fellow employees will not be tolerated." (*See* Doc. 27-2, PageID 360-61). Employees are prohibited from engaging in any matter which "undermines the integrity of Lorain County government." *Id.* Williamson's secret affair with Commissioner Hung plainly violated these policies and seriously tarnished the County's reputation with the public.

Finally, Williamson's bald allegation that the County "took no disciplinary action against employees who were involved in similar relationships but had not engaged in the same kind of protected conduct" is not supported by any evidence. (Doc. 29-1, Page ID# 491) (citing to Williamson's self-serving declaration and purported hearsay statements of Commissioner Hung). Indeed, Williamson obtained at least 33 separate employee personnel files from County officials during discovery in the 2022 state court case. (*See* Doc. 30-1, Lorain County's Responses to Plaintiff's Requests for Production Nos. 2-23) (requesting personnel files). Yet, he cannot identify a single instance where Lorain County

---

[6] The County produced Lundy's deposition transcript to Williamson in November of 2022. It is also bates-labeled by Williamson as part of his document production in this case.

failed to discipline another employee involved in a similar romantic relationship with another County employee or official.

Instead, the evidence shows that Williamson invented these allegations of retaliation after the affair became public and after he lost his job. Williamson's contemporaneous text messages, to the extent they have not been improperly redacted, show that he knew exactly why he was terminated. (Ex. C, at Williamson_001075-76) ("I DID READ IT. PUBLIC ADMISSION BY YOU. THEY WIN….MY JOB, MY CREDIBILITY, AND NOW FAMILY.") (Discussing newspaper article revealing the affair).[7] And, while Williamson's text messages establish direct lines of communications with Hung and Williams, not a single one mentions Williamson's alleged whistleblowing or any first amendment speech. That is precisely why Williamson musters only self-serving testimony and hearsay rather than actual evidence.

The same is true of Williamson's allegations that Defendants Moore and Lundy retaliated against him by "leaking embarrassing information about him to the press" and "freezing him out of government decision-making." (Doc. 29, Page ID# 479). Williamson provides no details about what information was purportedly leaked to the press or when this action took place. Also notably missing is any evidence of an injury caused by this alleged adverse action. A constitutional tort, like any other tort, "requires injury, and allowing constitutional redress for every minor harassment may serve to trivialize the First Amendment." *Mattox v. City of Forest Park*, 183 F.3d 515, 521 (6th Cir. 1999) (rejecting plaintiff's allegation that information contained in a public report could be an

---

[7] Just a couple of days later, Williamson further articulated his lawsuit's retaliatory intent, when he sent a text to Commissioner Hung that he wanted to "fry that bitch" referring to the County's outside legal counsel. (*See* Doc. 19, Page ID# 191).

adverse action because "[n]owhere does she attempt to concretize her personal injury. Without anything more specific, we cannot say that this meets the constitutional threshold required for her claim of First Amendment retaliation to proceed.")

Similarly, Williamson's contention that he was left out of "government decision-making" lacks critical details needed to constitute an adverse action. In fact, Williamson acknowledges that his role as 911 Director did *not* include setting policy or making decisions regarding policy. (*See* Doc. 1, Page ID# 10-11). Simply put, these generic assertions, like all those proffered by Williamson in this case, are blatantly vague and lack any cognizable evidence. The only party motivated by impermissible retaliation here is Williamson, and his meritless claims should be rejected.

ii.     <u>The 911 Center is not a public forum, and Williamson did not have the right to unfettered and disruptive exercises of purported free speech.</u>

Williamson's claim against Cordes, which stems from his employment with CenturyLink as a third-party vendor to the County, relies entirely on double hearsay without any corroborating evidence. (*See* Doc. 29-1, at ¶ 5) ("911 Director Tracy Lopez *told me* that her boss—who I knew to be Defendant Cordes—had banned me from the facility."); *id.*, at ¶ 6 ("Ms. Lopez *told me* that she would ask Mr. Cordes to talk to my boss to work out the issue there. Soon after, my boss *told me* that he had *talked to Mr. Cordes*, and he ordered me to stop talking about politics."); *see also* Doc. 31. In reality, Mr. Williamson was asked to leave the 911 Center for refusing to follow directions of County employees and unauthorized access to the facility without proper approval. (Doc. 27-5, Page ID# 374, Cordes An. to Interrog. No. 11). Likewise, Williamson identifies no cognizable injury, as he *voluntarily retired* from his employment with CenturyLink "just

a few days later." Williams even sent a congratulatory text to Williamson on his retirement. (Ex. C, Williamson_000797-98).

Cordes's purported instruction that Williamson "stay neutral" while working as a private employee at the County 911 Center, even if it happened, would not be an unlawful curtailment of free speech. As set forth in Defendants' opening motion, the Supreme Court has "long recognized that the government may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy." (Doc. 27, at Page ID#351) (quoting *Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 11 (2018)). Williamson cannot, and makes no effort to, dispute that the County 911 facility is a nonpublic forum where speech may be limited. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46-47 (1983) (recognizing that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government.") (quotations omitted). In nonpublic forums, the government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)).

Here, Williamson alleges that Cordes instructed him to "stay neutral" while working as an employee of CenturyLink performing services on the County's 911 system. Williamson had no First Amendment right to advocate on behalf of political candidates while working in the County's 911 Center. *See id.* (restricting access to a school district's intraschool mail system); *see also United States v. Kokinda*, 497 U.S. 720, 725 (1990) (finding prohibition of soliciting in the form of political campaigning outside post office was reasonable because walkway to enter post office was a nonpublic forum). The County 911 Center is tasked with receiving and routing emergency communications to ensure that

13

public safety resources can timely reach emergency situations. It is not a public forum for political campaigning, so if Cordes instructed Williamson to "stop talking politics" while working in the facility, that would be a completely reasonable restriction to prevent disruption to the County's 911 operations. *See Kokinda*, 497 U.S. at 733 (holding that the prohibited speech was "inherently disruptive" to the postal service's business and could be reasonably restricted). Because Williamson had no free speech right within the County's 911 Center, his claims against Cordes should be dismissed.

iii.  Williamson has not shown any violation of an Ohio civil right—let alone a "knowing" one.

Count Four, to the extent it does not mimic Count One, requires Williamson to prove a knowing violation by Defendants. *Jordan v. Murphy*, 145 F. App'x 513, 519 (6th Cir. 2005) ("Section 2921.45 imposes liability only if the constitutional violation was 'knowing.'") The statute's requirement that a public official act knowingly in depriving another of a constitutional or statutory right "is designed to protect public officials who act in the honest belief that their actions are authorized or required by law, but whose conduct is later determined not to have been authorized or required." R.C. 2921.45, 1974 Committee Comment to H511. Absent the "knowing" mental state, claims under R.C. 2921.45 must fail. *See Jordan*, 145 F. App'x at 519.

As articulated above, Williamson still offers no evidence that he was deprived of any rights guaranteed by the Ohio Constitution. Additionally, Moore and Lundy could not have acted knowingly because the evidence conclusively establishes that they acted with an honest, good-faith belief that Williamson's termination was warranted due to his secret extramarital affair with a supervisor. Likewise, Williamson has no evidence to suggest

that Cordes's purported instructions to "stay neutral" while working at the County's 911 Center resulted in an intentional deprivation of free speech rights.

### D. Williamson has all necessary discovery, and no additional discovery would create a genuine dispute of material fact.

Williamson's attempt to invoke Fed. R. Civ. P. 56(d) is a final Hail Mary in a last-ditch effort to avoid the inevitable. (*See* Doc. 29, Page ID# 486-89). In doing so, Williamson fails to acknowledge that over 36,000 pages of documents were given to him in response to substantively similar discovery requests in the underlying state court case. This included hundreds of pages of employee personnel files and thousands of emails and related documents. Simply put, Defendants have fully responded to Plaintiff's discovery requests in this case. (Doc. 30). More importantly, at the Court's most recent status conference on June 18, 2024, Williamson's counsel did not dispute that the purported outstanding discovery requests and missing document productions were unrelated to Defendants' pending motion for summary judgment.

There are six factors to consider when evaluating the merits of a Rule 56(d) request: 1) when the plaintiff learned of the issue that is the subject of the desired discovery; 2) whether the desired discovery would change the ruling of the trial court; 3) how long the discovery period lasted; 4) whether the plaintiff was dilatory in his discovery efforts; and 5) whether the defendants were responsive to discovery requests. *See Plott v. General Motors Corp.,* 71 F.3d 1190, 1196-1197 (6th Cir. 1995). Importantly, "[f]airness does not blindly require a district court to grant a non-movant an opportunity for discovery where, as here, the non-movant does not in any detail describe what discovery he needs or what material facts he hopes to discover." *St. John v. Cuyahoga Metro. Hous. Auth.,* No. 1:21CV2198, 2024 U.S. Dist. LEXIS 14827, at *37 (N.D. Ohio Jan. 26, 2024)

(internal quotes omitted). Additionally, "[i]t is not enough to state that discovery is needed without explaining *why* it is needed." *Id.* (emphasis in original).

Williamson claims that Defendants have "more or less refused to provide any meaningful response" to his discovery demands in this case but fails to explain what discovery is needed. (Doc. 29, Page ID 487). To the contrary, Defendants answered discovery and referred Williamson to the voluminous document productions already in his possession. (Doc. 30).[8] Moreover, Williamson's counsel has conceded that any outstanding discovery is not necessary for Defendants' dispositive motion. After years of litigation and armed with tens of thousands of documents, Williamson has put forth nothing more than a self-serving declaration replete with hearsay and vague statements. Delaying a ruling on Defendants' Motion for Summary Judgment at this point, especially given Williamson's repeated dilatory tactics only prolongs the inevitable. For these reasons, the Court should deny Williamson's request under Rule 56(d) and rule on Defendants' Motion for Summary Judgment.

## **CONCLUSION**

For the reasons discussed above, construing all evidence in Williamson's favor, Defendants respectfully request that the Court grant summary judgment in favor of Defendants on all remaining claims.

> Respectfully submitted,
>
> DOOLEY, GEMBALA, MCLAUGHLIN
> & PECORA CO., LPA
>
> */s/ Matthew A. Dooley*
> Matthew A. Dooley (0081482)

---

[8] Williamson claims to not know why the County terminated Tim Carrion but ignores the Joint Statement from Moore and Lundy on that topic, which was part of *Williamson*'s document production. (*See* Ex. A, Joint Statement).

Stephen M. Bosak, Jr. (0092443)
Michael R. Briach (0097986)
5455 Detroit Road
Sheffield Village, Ohio 44054
Telephone:    (440) 930-4001
Facsimile:    (440) 934-7208
Email:        mdooley@dooleygembala.com
              sbosak@dooleygembala.com
              mbriach@dooleygembala.com
*Counsel for Defendants*