```
 1            IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
```

**EXHIBIT B**

```
 4   THOMAS WILLIAMS,           ) CASE NO.1:21-CV-1863
                                )
 5             Plaintiff,       ) JUDGE BOYKO
                                )
 6        versus                )
                                ) DEPOSITION OF
 7   MICHELLE HUNG, et al.,     )
                                ) MATTHEW LUNDY
 8             Defendants.      )
```

- - - - - -

Deposition of **MATTHEW LUNDY**, a Defendant herein, called by the Plaintiff for Cross-Examination pursuant to the Federal Rules of Civil Procedure, taken by the undersigned, Shannon L. Newhall, a Registered Professional Reporter and Notary Public in and for the State of Ohio, at the offices of Sutter O'Connell, 3600 Erieview Tower, 1301 East 9th Street, Cleveland, Ohio, on Friday, the 29th day of April, 2021, at 10:00 a.m.

- - - - - -

**SN COURT REPORTING, LLC**
**shannon@sncourtreporting.com**
**330.417.4242**

```
 1    APPEARANCES:

 2
           On Behalf of the Plaintiff:
 3
                William J. Novak, Esq.
 4              Novak, LLP
                PO Box 1228
 5              Bath, Ohio 44210
                william@novak-law.com
 6              216.781.8710

 7
           On Behalf of the Defendants:
 8
                Robert E. Cahill, Esq.
 9              Sutter O'Connell
                3600 Erieview Tower
10              1301 East 9th Street
                Cleveland, Ohio 44114
11              rcahill@sutter-law.com
                216.928.3554
12

13
      ALSO PRESENT:
14
           Thomas Williams
15

16                            - - - - - -

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2    EXAMINATION BY                                         PAGE

 3    Mr. Novak                                                4

 4

 5    PLAINTIFF'S EXHIBITS (Marked)                          PAGE

 6    2, Page from Complaint, Page 5 of 24                     21

 7    3, Pages from Complaint, Page 15 of 24
         and Page 16 of 24                                     27
 8
      4, Copies of E-mails, four pages                         32
 9
      5, Journal Entry, January 4, 2021                        37
10

11

      DEFENDANT'S EXHIBITS (Marked)
12
      None
13

14
                              - - - - - -
15

16

17

18

19

20

21

22

23

24

25
```

```
 1   WHEREUPON,
 2                      MATTHEW LUNDY,
 3       after being first duly sworn, as hereinafter
 4       certified, testified as follows:
 5                        - - - - - -
 6                    CROSS-EXAMINATION
 7   BY MR. NOVAK:
 8   Q.  Good morning, Commissioner Lundy.  How are you?
 9   A.  Good morning.
10   Q.  Have you ever had your deposition taken before?
11   A.  Yes.
12   Q.  Can you tell me what kind of a case that was?
13   A.  That was Lorain County -- well, I think it was the
14       Addiction Services Board versus Lorain County,
15       when we were merging the two boards, mental health
16       and addiction services.  In fact, I think it was
17       actually mental health that was the lead litigant
18       in that case.
19   Q.  Were you a defendant in that case?
20   A.  Yes.
21   Q.  And have you ever had your deposition taken any
22       other time?
23   A.  That is the only time I have had a deposition.
24   Q.  Ever been a plaintiff or a defendant in a lawsuit?
25   A.  There was a lawsuit involving -- when I worked in
```

```
 1              should put it in front of the witness.
 2                   Do you have copies for me?  I was just
 3              asking.
 4                   MR. NOVAK:  You are kidding me.
 5                   MR. CAHILL:  I'm not, actually.
 6      A.   Do you have the actual registered vote?  There
 7           were many hires that took place that day.
 8      Q.   That's not my question.  My question for you is:
 9           As a county commissioner, wouldn't you like to
10           know if a co-commissioner is having an affair with
11           a prospective director, before that director is
12           hired?
13      A.   Yes.
14      Q.   Did you know that Commissioner Hung was having an
15           affair with Harry Williamson at the time he was
16           hired?
17      A.   No.
18      Q.   Did she say anything to you prior to January 4th,
19           2021 that they were having an affair?
20      A.   No.
21      Q.   And that's something you would have liked to have
22           known?
23      A.   Yes.
24      Q.   Do you think it's appropriate for a commissioner
25           in Lorain County to conduct business as a
```

1         commissioner without letting her co-commissioners
2         know that she is having an affair with one of the
3         directors?
4 A.  That should be disclosed.
5 Q.  I'm going to get back to that. But she never
6         disclosed it at the time he was hired; is that
7         correct?
8 A.  That is correct.
9            THE REPORTER: "At the time he was
10     hired?"
11            MR. NOVAK: At the time Harry Williamson
12     was hired.
13 Q.  Now, you are aware, are you not, that -- maybe you
14         left. Because you did leave last Friday a little
15         early. But are you aware that your lawyer
16         questioned Mr. Williams regarding possible
17         deletion of text messages from his cell phone?
18         Were you aware of that?
19 A.  No.
20            (Whereupon, Plaintiff's Exhibit Number 3
21     was marked for identification.)
22 BY MR. NOVAK:
23 Q.  Handing you what has been marked as Plaintiff's
24         Exhibit 3 --
25            MR. CAHILL: Bill, for the record, this

```
 1            that Commissioner Hung was having with Harry
 2            Williamson?
 3                    MR. CAHILL:  Objection.
 4                    To the extent you learned from counsel,
 5                do not answer.
 6      A.    I can only state in executive session.
 7                    MR. CAHILL:  Okay.  Then don't answer.
 8      Q.    Well, you didn't know about it when Harry
 9            Williamson was hired; is that correct?
10      A.    Did not.
11      Q.    You didn't know about it in February, did you?
12      A.    Did not.
13      Q.    Didn't know about it in March, did you?
14      A.    No.
15      Q.    Didn't know about it in April, did you?
16      A.    Did not.
17      Q.    Didn't know about it in May, did you?
18      A.    Did not.
19      Q.    Didn't know about it in June, did you?
20      A.    Did not.
21      Q.    You knew about it in July?
22                    MR. CAHILL:  Objection.
23                    To the extent you learned from counsel,
24                attorney-client privilege; do not answer.
25      Q.    Did you read about it in the local newspaper?
```

```
 1   A.   After the information was public.
 2   Q.   So you did read about it in the local newspaper?
 3   A.   After it was public.
 4   Q.   Right.  So you -- after it was public, you knew
 5        about it in July, based upon the newspaper
 6        article; isn't that correct?
 7              MR. CAHILL:  Objection, to the extent --
 8           I don't know when the timing was.  What
 9           article?  I -- I'm trying to protect the
10           privilege.  If you have got an article that
11           says that in July, great.  I thought those
12           were August.
13   Q.   You knew that she was having an affair in August;
14        isn't that correct?
15              MR. CAHILL:  Objection.
16              To the extent you learned other than from
17           counsel, you can answer.
18   A.   I'm trying to remember, Counselor, the -- you
19        know, the exact date, but it -- it was either late
20        July or --
21              MR. CAHILL:  Hold on.  To the extent you
22           learned from counsel, don't talk about it.
23           To the extent it was in the public domain --
24              THE WITNESS:  Oh, is that the question?
25           I'm confused by the question.  Whether I -- I
```

```
 1              was first asked about the media, and then I'm
 2              asked about when I knew about the --
 3                   MR. CAHILL:  Right.  To the extent you --
 4              you can't answer when you learned from
 5              counsel.
 6   BY MR. NOVAK:
 7   Q.   I've got a question.  I'm going to make this easy.
 8   A.   Okay.
 9   Q.   Did Commissioner Hung ever tell you that she was
10        having an affair with Harry Williamson?
11   A.   No, sir.
12   Q.   Never?
13   A.   No, sir.
14   Q.   You would agree with me that Harry Williamson --
15        I'm sorry, Tom Williams was terminated after the
16        affair with Harry Williamson became public?
17   A.   Harry was terminated after the affair became
18        public, and then Mr. Williams was terminated a
19        short time after Mr. Williamson was terminated.
20   Q.   Right.  A short time after?
21   A.   Right.
22   Q.   And the reason Williamson was terminated was
23        because of the affair; isn't that correct?
24   A.   That's a personnel matter that I discussed with
25        legal.
```

```
 1              MR. CAHILL:  To the extent you've made
 2         pronouncements on this in public, you can
 3         talk about that.  But you can't talk about
 4         what was discussed in executive session with
 5         counsel.
 6              THE WITNESS:  Right.  Right.
 7   A.   Yes, I voted to terminate Harry, and that was --
 8        that couldn't take place in the workplace.
 9   Q.   You were offended by that taking place in the
10        workplace, weren't you, personally offended?
11   A.   It's inappropriate.
12   Q.   And you also felt that it was inappropriate
13        because you should have known about it when this
14        was going on; isn't that correct?
15   A.   I think any employer would want to know that.
16   Q.   Did you ever make any recommendations, before Tom
17        Williams was terminated, to put him on any kind of
18        a probation?
19              MR. CAHILL:  Objection, to the extent it
20         would have been made to counsel.
21              To the extent these are discussions with
22         counsel, you cannot answer.  If you made that
23         to anyone other than counsel and not in
24         counsel's presence, you can answer.
25   A.   No, not that I recall.
```