| | | |
|---|---|---|
| **State of Ohio** | } | |
| | } | **Declaration of Michelle Hung in Lieu of Affidavit** |
| **County of Lorain** | } | **Pursuant to 28 U.S.C. § 1746** |

**Michelle Hung,** being duly cautioned, pursuant to 28 U.S.C. § 1746 and under penalty of the laws of perjury of the United States hereby declares as follows:

1. My name is Michelle Hung. I am an adult competent to testify in a court of law and under no disability that would prevent my doing so truthfully. The statements set forth in this Declaration are based upon my personal knowledge and true to the best of my recollection and knowledge.

2. I was elected to the Lorain County, Ohio Board of Commissioners ("the Board") on November 3, 2020. I served as President of the Board in 2021.

3. David J. Moore ("Moore") was elected to the Board on November 3, 2020. Moore served as Vice President of the Board in 2021.

4. Tom Williams ("Williams") was hired as Lorain County Administrator on January 4, 2021. Moore had recommended to me that Williams be hired for this position. When Moore first spoke to me about hiring Williams, I perceived from his remarks that the two of them were old friends, and had known one another for years.

5. In early September 2020, Williams introduced me to Harry Williamson ("Williamson").

6. Williamson and I became friends, and over time our friendship developed into a romantic relationship.

7. In December 2020, Lorain County was seeking to hire a new Director for the County 911 Center. After one candidate for that job, Ron Barlow, declined to further discuss taking the position, Williams contacted Williamson and offered the job to him. Williams related this to me in a telephone call between us after he had made the offer to Williamson.

8. In late December 2020, before Williamson was hired, I had a discussion with Jen Sinatra, the incoming Human Resources Director for Lorain County, during which I disclosed to her that Williamson and I were in a romantic relationship. I did this because I wanted to be sure that our being in a relationship would pose no legal or ethical problems if he was hired. Ms. Sinatra informed me that because Williamson would be reporting Directly to Williams, and not to me, that she did not believe this was problematic.



PLAINTIFF'S EXHIBIT 1

9. During its organizational meeting held or about January 4, 2021, the Board retained the services of the firm Ulmer & Berne to advise the Board on labor and employment matters, general counseling, benefits issues, economic development issues and other matters assigned by the county.

10. On or about January 11, 2021, I spoke with Ms. Martinsek by telephone, informed her about my relationship with Williamson, and asked for her legal opinion regarding that relationship. She told me that she would discuss that matter with a colleague and get back to me. The next day, Ms. Martinsek called me, said that she had discussed the matter with her colleague Bill Edwards, and that in their opinion, because Williamson reported to Williams and not to me, my relationship with Williamson did not present an issue.

11. Williamson and I thereafter were open about our relationship and made no effort to conceal it from County officers or employees. We attended various functions and events together, arriving together, mingling with others together, and leaving together. We did so at any number of events, including official functions, political events, personal outings, parties and other events, including in one instance a party thrown by Lorain County Prosecutor J.D. Tomlinson.

12. I believe that Williamson and I conducted ourselves publicly as a couple, and that given the way in which we appeared together it would have been obvious to any reasonable and attentive person that he and I were involved in a romantic relationship. I discussed my relationship with him with County H.R. Director Sinatra on several occasions, and recall that on at least one occasions she told me that "it was obvious" that Williamson and I "adored" one another.

13. After January 2021, Ms. Martinsek and I engaged in many conversations, in person and on the telephone, which involved topics outside any relationship we had as attorney and client and consisted of "girl talk" involving our personal and romantic lives. I discussed with her my own relationship with Williamson, and she shed with me details of her own personal relationships, including a relationship with an attorney from Bath, Ohio, to whom she referred as "Bill." I would later learn that this was Attorney William Novak.

14. In 2021, the Board, in response to concerns that funds meant for the 911 Center were being misspent or misallocated. Williams, as County Administrator, tasked 911 Center Director Williamson with identifying any misspent or misallocated funds. This task was in addition to Williamson's other duties as 911 Center Director. I recall seeing emails from Williamson to Williams regarding these efforts. I also recall meetings being scheduled to discuss the subject and attending at least one such meeting, which Williams also attended. I recall that at least one other meeting regarding the question of misspent funds was held at the 911

Center and attended by, among others, County Budget Director K.C. Saunders, though I did not attend that meeting.

15. I recall Williamson repeatedly trying to communicate to Williams information relating to misspent funds, including in emails which I read and in conversations I overheard.

16. By March 2021, I began to feel pressure to simply go along and approve Board business in the manner that Moore desired. This pressure included being told by Williams that "Dave has made promises to these people." I felt the message was that I was expected to help Moore keep those promises and that I would place certain resolutions on the Board agenda and support certain others for that reason. In one particular instance, I was told how I should vote relative to a certain resolution because it was "what Dave want[ed]."

17. On or about March 30, 2021, I told Williams that I would not agree simply to rubber stamp resolutions because Moore supported them, nor cast my vote in a way calculated to help his political supporters. I expressed the same sentiment to Martinsek during a fifty minute telephone conversation the same night.

18. Beginning in March 2021, I began to feel intense pressure to change my position on the sort of emergency radio network the County would adopt in connection with an upcoming revamp of the radio system used by various first responders in the County,

19. I supported the adoption of a "Phase 2" system that was widely supported by first responders in the County. I received pressure from Moore, Williams, then Assistant County Prosecutor Dan Petticord and from certain officials in North Ridgeville to change my position and join them in supporting a "Phase 1" system, that I felt would not best serve the needs of the County and was thus unwilling to support.

21. On June 24, 2021, Williamson scheduled a meeting with me and Williams in Williams' office, during which Williamson tendered his resignation as 911 Center Director, which resignation Williams (in vulgar terms) refused to accept. Williamson did not inform me in advance of that meeting of his intention to tender his resignation.

22. During 2021, access to the 911 Center was controlled by fingerprint access. In June 2021, I was informed by a County information technology employee, Dave Welch, that Ms. Sinatra was not forwarding to him information about persons who had left County employment, and that he could not properly limit the fingerprint access of former employees to County facilities, including the 911 Center, which was to me a significant security concern.

23. This was one of several instances in which I believed that Ms. Sinatra was not performing her duties in a manner consistent of what was expected of her. On July 12, 2021, I requested that Williams conduct an employee evaluation of Ms. Sinatra, based on this incident and

others. This would have been a sixth-month review for Ms. Sinatra. Williams thereafter set a meeting between himself and Sinatra to be held the next day, July 13, 2021.

24. On June 23, 2021, the Board unanimously directed Williams to negotiate contracts with Cleveland Communications, Inc. for the lease of a radio tower on Burns Road to be used to facilitate safety communications by the County and certain of its municipalities.

25. On July 16, 2021, an email was sent to the Board by Chris Kish, Executive Assistant to Williams, stating that Williams was refusing to negotiate a tower antenna agreement with Cleveland Communications, despite having been directed to do so by the Board. Williams was thus refusing a direct order from the Board in this regard. The negotiations were ultimately conducted by Interim County Administrator Rob Weber, and the Board approved the lease in October 2021.

26. On July 17th, 2021, I called Ms. Martinsek and requested that Ulmer & Berne lawyers attend the executive session on the upcoming Wednesday to discuss the employment resolutions relative to Ms. Sinatra and Mr. Williams. On July 19th, 2021 Commissioner Lundy called her and made the same request via voice message. Ms. Martinsek emailed his voice mail request to Mr. Williams, disclosing the request to the very employees the Commissioners wished to discuss, and thus disclosing confidential information to him.

27. On July 28, 2021, I attended an executive session of the Board that was also attended by Ms. Martinsek. During that session, Ms. Martinsek announced that she had for some time known that Williamson and I had been engaged in a romantic relationship. Others attending the meeting then asked me if it was true that Williamson and I were in such a relationship. I confirmed that it was, that it was no secret, and that I would have told them so if they had asked.

28. As previously noted, Williamson and I had conducted our relationship openly, in such a way that our involvement would have been obvious to those who observed us together, including Moore and Williams. Ms. Sinatra– as previously discussed above — had commented on how obvious it was that Williamson and I adored one another. As previous discussed above, Ms. Martinsek and I had discussed my relationship with Williamson several times, albeit in the context of personal conversations.

29. My relationship with Williamson was known prior to our having been recorded, on a surveillance tape, exchanging a small kiss when briefly parting company (I was headed to the restroom) at the Gateway Center on or about February 26, 2021.

30. Moore pressured me to support resolutions which I believed did not benefit the County or its citizens, but instead served to promote Moore's personal business and financial goals. Tom Williams and Commissioner Moore conducted county business using their personal email addresses with the intent to keep their communications off county servers.

31. While Williamson was still employed by the County, Williams himself was engaged in a personal relationship with an employee who worked in the County Children's Services department. This was known to the Board as early as May 2021 and could be ascertained from social media posts showing the two together. Williams introduced this employee to me in his office, spoke about her in the context of his personal and intimate relationship with her freely and even sent me pictures of her via text message.

32. As early as July 2021, the Board knew of other relationships that existed between County employees, including a director and a direct subordinate employee. This information was not disclosed to me by the director, despite my having twice interviewed her for a promotion. When this relationship was revealed, Commissioners Moore and Lundy showed no interest in pursuing discipline or termination of either employee. This occurred prior to the termination of Williamson.

33. While Williamson was still employed by the County, members of the Board were aware that other county employees had personal relationships with one another, were dating and even married. Not one of those employees — save Williamson — was subject to any discipline that was ostensibly linked to those relationships.

34. On August 3, 2021, attorneys Martinsek and Edwards attended an executive session meeting of the Board and distributed a memorandum a copy of which is attached hereto as Declaration Exhibit A.

**Further Declarant Sayeth Naught**

I hereby affirm under penalty of perjury under the laws of the United States that the foregoing is true to the best of my knowledge and belief in witness whereof I have signed below on this 4th Day of September 2024 at North Ridgeville, Lorain County, Ohio.

Michelle Hung



EXHIBIT A

### MEMORANDUM

**CONFIDENTIAL ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED COMMUNICATION**

**TO:** Amanda Martinsek

**FROM:** William D. Edwards

**DATE:** August 1, 2021

**RE:** **Proposed Termination of Harry Williamson Employment**

---

You asked me to evaluate the potential risk associated with the termination of Harry Williamson's employment as the Director of the Lorain County Emergency 911 Dispatch Center ("Director"). For the reasons detailed below, I view any legal exposure to the County associated with Mr. Williamson's termination as low. My opinion is not intended to suggest that Mr. Williamson will not sue the County in connection with the termination of his employment. Anyone can sue or be sued. However, based on the facts that have been presented to me thus far, I see no evidence that Mr. Williamson would be successful in the event he pursued a claim for wrongful termination against the County.

Based on my review of a December 10, 2020 Conditional Offer of Employment, Mr. Williamson has been employed in his current position since approximately January 5, 2021. My understanding is that Mr. Williamson is a white male who is approximately 60 years of age. I have been informed that, to date, Mr. Williamson has not complained about any aspect of his employment at Lorain County.

As a Director, Mr. Williamson is an "at-will" employee who may be terminated from employment at any time and for any reason by the Lorain County Board of Commissioners ("Board"), provided that the reason for termination is not prohibited as a matter of law. Because Mr. Williamson is an "at-will" employee, the Board is not required to provide Mr. Williamson with a specific reason for his termination. Thus, the Board may opt to simply indicate to Mr. Williamson words to the effect that it is "going in a different direction" or "has decided to make a change" in connection with the termination of his employment. In the event Mr. Williamson alleges some type of unlawful discriminatory treatment tied to his termination, the County would be required to articulate a non-discriminatory reason or reasons regarding why it terminated Mr. Williamson's employment. This is not a difficult task. Ultimately, the burden of establishing a violation of an anti-discrimination statute will always rest with Mr. Williamson. In the context of an age discrimination allegation, for example, Mr. Williamson would be required to demonstrate by a preponderance of the evidence that, "but for" his age, the County would not have ended the employment relationship.

**CONFIDENTIAL ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED COMMUNICATION**

Given the recent disclosure by Commissioner Michelle Hung regarding her extramarital affair with Mr. Williamson, it is unlikely that any claim of unlawful discrimination against the County would be successful. Last week, on Wednesday, July 28, 2021, Commissioner Hung informed Commissioners Lundy and Moore for the first time that she and Mr. Williamson have been involved in an extended extramarital affair with one another. Pursuant to the current version of the Lorain County Board of Commissioners Personnel Policy Manual ("Manual"), "[a]ll employees are **expected to maintain the highest possible ethical and moral standards**" . . . and **"[c]onduct that** interferes with normal business operations, **brings discredit to the Office or County**, is illegal, **or is offensive to the public or fellow employees will not be tolerated."** (emphasis added). Prohibited activities in this regarding include engaging in any matter which **"undermines the integrity of Lorain County government."** While conduct "violating morality or common decency" is listed as a "Group II Offense" in the Manual, thus suggesting the possibility of progressive discipline in this instance, the Manual also states that the County maintains the right to impose different levels of discipline when mandated by the circumstances of a specific situation. Here, termination is warranted since Mr. Williamson's affair with Commissioner Hung undermines the integrity of Lorain County government, brings discredit to the County, and does not maintain "the highest possible ethical and moral standards."